## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FILED

------------------------------------------------------------x
:
S.A.C. CAPITAL ADVISORS, LLC,                    Civil Action 2010. FEB 17 P 1: 42
:
Plaintiff,                    **COMPLAINT FOR**
:                             **VEXATIOUS SUIT AND**
- against -                                      **ABUSE OF PROCESS**
:
BIOVAIL CORPORATION and JOHN DOES               JURY TRIAL DEMANDED
1-10,                                        :
**3 10 C V 2 3 7  M RK**
Defendants.                    :
------------------------------------------------------------x

Plaintiff S.A.C. Capital Advisors, LLC ("SAC" or "Plaintiff") respectfully

submits this Complaint for Vexatious Suit and Abuse of Process against Defendants Biovail

Corporation ("Biovail") and John Does 1-10 (collectively, "Defendants").

### PRELIMINARY STATEMENT

1.      This Complaint seeks damages arising from Defendants' campaign of

vexatious suits and abuse of process against Plaintiff and others, including, with malice and

without probable cause, the filing and prosecution of a RICO action against SAC in New Jersey

Superior Court (the "RICO Action"[1]) and the directing of the filing and prosecution of a

purported Biovail shareholders' securities class action against SAC in the United States District

Court for the District of New Jersey (the "*Del Giudice* Action"[2]).  The allegations of the RICO

Action and the *Del Giudice* Action were false, scandalous and outrageous, the damages sought

were a stunning $18 billion, and the litigations were accompanied by a frenzied and well-

---

[1]      *Biovail Corporation v. S.A.C. Capital Management, LLC, et al.*, No. ESX-L-1583-06 (N.J. Super. Ct. Law Div.).

[2]      *Del Giudice v. S.A.C. Capital Management, LLC, et al.*, No. 06-cv-1413 (D.N.J.).  A copy of Judge Stanley R. Chesler's February 19, 2009 opinion dismissing plaintiff's amended complaint in the *Del Giudice* Action (hereinafter, the "*Del Giudice* Opinion") is attached hereto as Exhibit A.

orchestrated media campaign attacking SAC and others. Both actions terminated in SAC's favor, having been dismissed in their entirety.

2.     The allegations in the RICO Action and *Del Giudice* Action were baseless when made, "part of a choreographed strategy by Biovail and its attorneys designed to constitute a counterattack"[3] against a dangerous and, as later events would reveal, well-founded securities class action brought against Biovail by its shareholders in the United States District Court for the Southern District of New York (the "*Biovail* Securities Action"[4]). Defendants' prosecution of the RICO Action and direction of the prosecution of the *Del Giudice* Action also sought to divert attention from criminal and regulatory inquiries into Biovail's own misconduct that threatened, and eventually resulted in, serious criminal and regulatory charges, fines and sanctions against Biovail. Among other things, these governmental proceedings, and the findings against Biovail in which they resulted, revealed the complete and utter lack of merit underlying the allegations Defendants maliciously made and directed against SAC in the RICO Action and the *Del Giudice* Action.

3.     United States District Judge Stanley R. Chesler, presiding over the *Del Giudice* Action, found the allegations against SAC to be "untenable" and "incompatible with Biovail's admission of guilt in a kickback scheme that the Amended Complaint accuse[d] [SAC and others] of falsely reporting and with Biovail's admissions, in connection with the settlement of the SEC enforcement action, of making false statements that inflated its stock price."[5] Judge Chesler dismissed the *Del Giudice* Action on February 19, 2009 as part of the court's imposition

---

[3]     *Del Giudice* Opinion, Ex. A, at 23.

[4]     *In re Biovail Corporation Securities Litigation*, No. 03-cv-8917 (S.D.N.Y.).

[5]     *Del Giudice* Opinion, Ex. A, at 21.

of sanctions against the plaintiff and attorneys that had carried out, at Biovail's direction, the prosecution of the vexatious suit against SAC and others.

4.    Following Judge Chesler's decision, Judge Donald S. Goldman of the New Jersey Superior Court, presiding over the RICO Action, urged Biovail to dismiss the RICO Action voluntarily.  Biovail declined, insisting on continuing to pursue its core allegations of wrongdoing while abandoning some of its legal theories and theories of damages.  On August 20, 2009, Judge Goldman dismissed with prejudice even this stripped-down version of the Biovail complaint.  This decision, which Biovail did not even bother to appeal, brought to an end a calculated three-and-one-half year campaign of frivolous litigation and accompanying negative publicity without a single claim asserted by Biovail or its proxies surviving past the pleadings.

5.    Defendants commenced and prosecuted the RICO Action and directed the commencement and prosecution of the *Del Giudice* Action without probable cause and with malicious intent unjustly to vex and trouble Plaintiff, as Defendants knew there were no reasonable grounds for prosecuting either action.  Defendants used the proceedings in the RICO Action and the *Del Giudice* Action primarily to accomplish the improper purpose of manufacturing claims against SAC to distract attention from the meritorious claims brought against Biovail by its own shareholders in the *Biovail* Securities Action and from then-developing criminal and regulatory inquiries.  In so doing, Defendants acted with reckless indifference to the rights of SAC and others, and demonstrated an intentional and wanton violation of those rights.

6.    Because of the falsity and scandalous nature of the allegations charging SAC and others with systematic and ongoing criminal conduct, the multiplicity of parties charged, the foreign forum involved, and the enormous amounts of damages sought, SAC was forced to incur tens of millions of dollars in unnecessary legal fees and other costs of defense, not to mention incalculable damage to its reputation.  SAC now seeks three times its costs of defense for Defendants' vexatious and malicious conduct in addition to the costs of litigating this action.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds the sum of $75,000 and there is complete diversity of citizenship between all the parties.

8.    This Court may exercise jurisdiction over the Defendants pursuant to Fed. R. Civ. P. 4 and the Connecticut Long-Arm Statute, Conn. Gen. Stat. §§ 33-929(f) and 52-59b(a).

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2) and (d) because a substantial part of the events giving rise to this claim occurred in this District and/or was intended to injure parties in this District, Plaintiff's injury occurred in this District, and Defendants are aliens who may be sued in any judicial district.

## PARTIES

10.    Plaintiff SAC is a private investment advisory firm.  SAC is a Delaware limited liability company, with its principal place of business in Stamford, Connecticut.  Its members – S.A.C. Holdings, Inc. and S.A.C. Partners, L.P. – are entities organized under the

laws of the State of Delaware and are in turn owned and controlled by Steven A. Cohen ("Cohen"), a resident of Connecticut.

11.    Defendant Biovail is a specialty pharmaceutical manufacturer incorporated in Canada under the *Canada Business Corporations Act*, having its principal place of business in Mississauga, Ontario and its principal executive offices at 7150 Mississauga Road, Mississauga, Ontario, Canada, L5N 8M5. Biovail is a reporting issuer in the province of Ontario. Biovail operates facilities in the United States, Canada, Barbados and Puerto Rico, with its primary markets being the United States and Canada, and has approximately 1,300 employees worldwide. Biovail's common stock trades on the Toronto Stock Exchange and the New York Stock Exchange ("NYSE").

12.    John Does 1-10 are agents of Biovail, including lawyers and public relations professionals, known and unknown, who assisted Biovail in carrying out the campaign of vexatious suits and abuse of process described herein and who knew or may have known that such litigation was baseless and carried out primarily for an improper purpose.

## FACTS

### Biovail Violates the Federal Securities Laws and Faces a Shareholder Securities Class Action as a Result

13.    In the first half of 2003, the value of Biovail's common stock rose to an all-time high of roughly $50 per share on the NYSE, based on Biovail's reported strong financial performance and optimistic predictions for future performance. However, in the second half of 2003, as a result of, among other things, Biovail's failure to meet its previously announced financial targets, widely-publicized questions about the propriety of its marketing of a key new drug, and reports of regulatory inquiries into its accounting practices, Biovail's share price

declined dramatically, to a low of roughly $17 per share in December 2003. Throughout the following years, marked by criminal and regulatory investigations and charges, failures in the performance of its products, and disappointing periodic earnings accounts, Biovail's share price has never recovered and trades today at less than $15 per share on the NYSE.

14.     Following the collapse of Biovail's share price, a proposed class of Biovail shareholders who purchased stock between February 7, 2003 and March 2, 2004, filed a class action lawsuit in the United States District Court for the Southern District of New York alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 against Biovail, Eugene Melnyk ("Melnyk") – its then Chief Executive Officer – and two other Biovail executives. The first amended complaint in the *Biovail* Securities Action, dated June 18, 2004, alleged, among other things, that Biovail artificially inflated its 2003 earnings, in part as follows:

          a.     The PLACE Fraud:  Through a program known as Proving LA through Clinical Experience ("PLACE"), according to the *Biovail* Securities Action complaint, Biovail paid doctors to write prescriptions for Cardizem LA, an anti-hypertension drug Biovail launched in 2003, disguising these payments as compensation for conducting fictitious clinical trials. Biovail used the prescriptions generated by this improper kickback scheme to report artificially-inflated sales figures for Cardizem LA.

          b.     The Truck Accident Fraud:  On October 3, 2003, according to the *Biovail* Securities Action complaint, Biovail acknowledged that it would not meet its fiscal year 2003 third quarter estimates but falsely attributed the missed targets in part to the destruction of a September 30, 2003 shipment of an antidepressant drug, Wellbutrin XL. The shipment was involved in a truck accident in Illinois on October 1, 2003 (the "Truck Accident") that Biovail claimed caused between $10 and $20 million in losses. Plaintiffs in the *Biovail* Securities Action alleged that the Truck Accident could only have resulted in a loss of, at most, $5 million, a fact Biovail would later concede. (The SEC later alleged that the truck accident could not have affected Biovail's third quarter earnings at all under generally accepted accounting principles ("GAAP") because Biovail could not have recognized revenue from the shipment in question until the fourth quarter.)

15.     A second amended complaint in the *Biovail* Securities Action was filed under seal on August 25, 2006, and subsequently unsealed on April 28, 2008. The second

amended complaint re-stated the allegations concerning the PLACE program and the Truck

Accident frauds and additionally alleged, among other things, that Biovail improperly delayed

recognizing certain research and development expenses in the appropriate period by shifting

them to an off-balance sheet entity known as PharmaTech LLC ("PharmaTech").

16.    Although not widely known in the business and financial communities,

but as subsequent events would show, Biovail was under criminal and regulatory investigations

at the time the *Biovail* Securities Action was filed, with federal authorities investigating Biovail's

marketing practices and the suspected inflation of Biovail's share price (before its decline in the

latter half of 2003).

### Biovail Falsely Alleges Its Negative Financial Results Were Caused by Plaintiff's Purported Racketeering Activities

17.    In response to the *Biovail* Securities Action and the concurrent criminal

and regulatory investigations, Defendants, under the direction of Melnyk, devised the strategy of

going on the offensive, blaming Plaintiff, various other investment firms, and certain research

analysts for its troubles. At Melnyk's direction, Biovail concocted a plan to attribute its share

price decline to a purported "short-seller conspiracy." Biovail's plan was designed to exploit the

public's lack of understanding about the practice of short-selling (that is, taking a position in a

company's stock that profits if the company's share price declines) and to convey the false

impression that Plaintiff and others had fabricated reports about the misconduct in which Biovail

had actually engaged. At all times, Defendants knew no such conspiracy existed.

18.    The first step in Biovail's plan to attribute its share price decline to

Plaintiff's alleged actions involved the filing of the RICO Action in New Jersey Superior Court

on February 22, 2006, alleging violations of the New Jersey state anti-racketeering laws and

other New Jersey common law torts. The complaint in the RICO Action alleged generally that

Plaintiff and others engaged in a widespread campaign of securities fraud and market

manipulation directed at Biovail and numerous other public companies. The supposed objective

of the alleged criminal enterprise was to drive down the price of the securities of target

companies by spreading false information about them, thereby profiting from short positions in

those securities. The RICO Action attributed the decline in Biovail's share price to this supposed

criminal conspiracy and sought nearly $14 billion in damages after trebling.

19.    With respect to SAC, the RICO Action alleged falsely that certain

independent news articles and analyst reports were "ghost-written" by SAC and, contrary to the

allegations in the *Biovail* Securities Action, were untrue. Specifically, the RICO Action alleged

that Plaintiff and others violated New Jersey's anti-racketeering statute and committed various

common law torts by causing the following assertions to be made about Biovail:

        a.    That the PLACE program was an improper attempt to boost sales
of Cardizem LA;

        b.    That Biovail had underreported its research and development
expenses by shifting those costs to PharmaTech; and,

        c.    That Biovail's announcement in October 2003 that its missed third
quarter earnings was the product of the Truck Accident was false and misleading.

20.    Defendants lacked a reasonable, good faith belief in the facts alleged and

the validity of the claims asserted in the RICO Action; indeed they knew the allegations to be

false. Moreover, Defendants initiated and used the proceedings in the RICO Action primarily to

accomplish the improper purpose of seeking to obfuscate the truth of their own misconduct (as

alleged in the *Biovail* Securities Action), to divert attention from the ongoing criminal and

regulatory investigations into their fraudulent activities, and to sully SAC's reputation in the public domain.

21.    The RICO Action was filed in New Jersey state court despite the fact that virtually all of the parties originally named were located outside New Jersey and no relevant conduct was alleged to have occurred in New Jersey. Instead, Defendants sought to take advantage of the *in terrorem* effect of the New Jersey RICO statute, with its provisions for treble damages and the recovery of attorneys' fees. Biovail could not have asserted a RICO claim for treble damages in any appropriate forum, either because the forum recognized no such cause of action (Canada, New York, Connecticut) or because the forum expressly rejected RICO claims based on predicate acts of alleged securities fraud (Arizona, all federal courts). Defendants chose New Jersey state court as the forum for the RICO Action with knowledge that neither the parties nor the alleged underlying events had any connection to the State of New Jersey.

22.    The summons and complaint in the RICO Action, containing the false representations and allegations described herein, were served upon Plaintiff and Cohen in Connecticut by personal service. Defendants also purported to serve other parties affiliated with Plaintiff and Cohen by delivering copies of the summons and complaint to persons in Connecticut.

23.    Plaintiff moved to dismiss the RICO Action, but, before briefing on Plaintiff's motion to dismiss was completed, Judge Goldman stayed the action pending the termination of a discovery stay issued by the *Del Giudice* Action court pursuant to the Securities Litigation Uniform Standards Act of 1998.

### Biovail Directs the Filing of the Baseless *Del Giudice* Action by a
### Purported Class of Biovail Shareholders

24.    Shortly after filing the RICO Action, Biovail moved forward with the second step in its plan to shift responsibility for its own fraudulent conduct. Defendants sought to create the impression that Biovail's shareholders were independently outraged by the supposed criminal conspiracy described in the RICO Action. To do so, Defendants engineered a phony purported shareholder securities class action litigation – the *Del Giudice* Action – that was in fact conceived and directed by Defendants in all material respects.

25.    On March 24, 2006, Thomas A. Gentile ("Gentile"), of Lampf, Lipkind, Prupis & Petigrow, on behalf of plaintiff Guy Del Giudice ("Del Giudice"), filed a proposed class action complaint in the United States District Court for the District of New Jersey on behalf of purchasers of Biovail stock who sold their securities after June 5, 2003. The complaint alleged a "stock market manipulation scheme," pursuant to which Defendants "after having taken short positions . . . manipulated the market for Biovail stock and artificially lowered its stock price by . . . disseminating materially false and misleading information concerning Biovail." The *Del Giudice* Action complaint sought more than $4 billion in damages.

26.    Judge Chesler, who presided over the *Del Giudice* Action, later found that the complaint "parroted the RICO [A]ction complaint almost verbatim, adding a federal securities fraud claim."[6] Judge Chesler also determined that, though Biovail was not a named plaintiff, the initiation of the *Del Giudice* Action was at the direction and request of Biovail:

> [The complaint] was not prepared by Del Giudice's attorney, Gentile, but rather it was drafted by Biovail's counsel at Biovail's [direction]. Biovail's counsel, moreover, identified a shareholder to serve as the plaintiff in the Del Giudice

---

[6]    *Del Giudice* Opinion, Ex. A, at 4.

action. [Biovail's counsel] sent Gentile the Complaint, which Gentile filed hours after receiving it via e-mail, without meeting his Biovail-selected client, reviewing documents underlying the Complaint or interviewing witnesses regarding the conduct alleged. The Del Giudice Complaint was the first securities fraud class action complaint Gentile had ever filed. Gentile admitted he made no substantive changes to the document he received, other than to remove a reference to an investigation on which the allegations were based.[7]

27.    As with the RICO Action, Defendants lacked a reasonable, good faith

belief in the facts alleged and the validity of the claims asserted in the *Del Giudice* Action;

indeed they knew the allegations to be false. Moreover, Defendants directed the initiation of and

used the proceedings in the *Del Giudice* Action primarily to accomplish the improper purpose of

seeking to obfuscate the truth of their own misconduct (as alleged in the *Biovail* Securities

Action), to divert attention from the ongoing criminal and regulatory investigations into their

fraudulent activities, and to sully SAC's reputation in the public domain.

28.    Like the RICO Action, the *Del Giudice* Action had no significant

connection to the State of New Jersey. The named plaintiff, Guy Del Giudice, was a resident of

Texas. Almost none of the relevant parties resided in New Jersey, and none of the relevant

conduct was alleged to have occurred there. The *Del Giudice* Action was filed in New Jersey for

the sole purpose of bolstering Biovail's claim that New Jersey's RICO statute should be applied

against Plaintiff and others in the RICO Action.

29.    The summons and complaint in the *Del Giudice* Action, containing the

false representations and allegations described herein, were served upon Plaintiff and Cohen in

Connecticut by personal service. Defendants also purported to serve other parties affiliated with

---

[7]    *Id.* at 7-8.

Plaintiff and Cohen by delivering copies of the summons and complaint to persons in Connecticut.

### Biovail Launches a Publicity Campaign Maliciously Targeting Plaintiff

30.     Both the RICO Action and the *Del Giudice* Action were accompanied by, and highlighted in, an intense media campaign designed to smear SAC and Cohen and to portray Biovail and Melnyk as the victims of a criminal conspiracy. Biovail distributed the complaint in the RICO Action widely and caused the publication and dissemination of media reports in Connecticut and elsewhere describing Defendants' false allegations, among other things, inviting members of the press to a media room said to contain documentation supporting Biovail's outlandish damages claims.

31.     The RICO Action in fact received widespread media coverage. For example, two days after the *Del Giudice* Action was commenced, on March 26, 2006, a story aired on the television news program *60 Minutes*, entitled "Betting on a Fall." Biovail orchestrated this supposed news feature in its continuing effort to bolster the false allegations against SAC in the RICO Action and *Del Giudice* Action and to inflict injury upon Plaintiff in the State of Connecticut and elsewhere. The story featured an interview with Melnyk in which he falsely stated that "[t]he damage that was suffered by the company [*i.e.*, its share price decline] we – we can attribute directly to the reports [supposedly orchestrated by SAC] that came out." The *60 Minutes* story also featured aerial photos of Cohen's residence in Connecticut and grainy surveillance photos of Cohen apparently taken by a private investigator employed by Biovail.

32.    Gentile admitted in proceedings during the course of the *Biovail* Securities

Action that the impetus for filing the *Del Giudice* Action was the imminent airing of the *60*

*Minutes* piece. Judge Chesler found that there was "no justifiable reason to rush" filing of the

complaint,[8] and so Gentile's investigation – or lack thereof – before initiating the *Del Giudice*

Action at the Defendants' direction was not reasonable.

33.    In addition, Defendants caused the publication and dissemination of

negative and fallacious articles in several national newspapers widely distributed within

Connecticut, including the *New York Times* and the *Wall Street Journal*, drawing upon the false

and scandalous allegations in the RICO Action and the *Del Giudice* Action, with the intention of

inflicting injury upon Plaintiff in the State of Connecticut and elsewhere. Indeed, Plaintiff

suffered damage as a result of all of Defendants' media-related communications and its extensive

smear campaign.

### It Becomes Apparent the Allegations in the RICO Action and *Del Giudice* Action Were Knowingly False When Made

34.    In 2006, when Melnyk and Biovail launched their attempt to attribute

Biovail's share price decline to Plaintiff, they knew perfectly well that the allegations made by

Biovail's own shareholders in the *Biovail* Securities Action were substantially true and that the

attempted attribution of the decline in Biovail's share price to a short-seller conspiracy

orchestrated by SAC was a fiction. Among other things, Melnyk and Biovail knew that the

PLACE program was a scheme to bribe doctors to prescribe Cardizem LA. They knew that

Biovail's 2003 earnings were inflated in part by the improper shifting of liabilities to

---

[8]    *Del Giudice* Opinion, Ex. A, at 16.

PharmaTech. And they knew that the Truck Accident was not the reason Biovail missed its

third-quarter guidance.

      35.    The truth about Biovail's and Melnyk's misconduct emerged over time, as

demonstrated in part by the following events:

      a.    On May 16, 2007, Melnyk announced that he was resigning from
his post as Chairman of Biovail. In his resignation announcement, Melnyk disclosed that he
received a "Wells" notice from the SEC the previous day, which indicated the SEC's
enforcement staff intended to bring civil charges against him. Melnyk subsequently resigned,
effective June 30, 2007.

      b.    In September of 2007, following nine days of evidentiary hearings
in the *Biovail* Securities Action regarding discovery abuses by Biovail affecting Banc of
America Securities LLC ("BAS") and its analyst, David Maris ("Maris"), persons who were
alleged to have been part of the so-called "short-seller conspiracy," Biovail entered into a
settlement agreement with BAS and Maris. As part of that settlement, Biovail agreed to drop
Maris as a defendant in the RICO Action, to release Maris and BAS from any and all claims
Biovail may have had against them, and to pay BAS a sum reported to be $2 million as
reimbursement for legal fees incurred.

      c.    On December 11, 2007, the parties to the *Biovail* Securities Action
announced a settlement pursuant to which Biovail agreed to pay the shareholder class
$138 million. Of the $138 million, $83.1 million was paid by Biovail itself, not out of insurance.
The settlement was the second largest ever in a securities case involving a Canadian issuer. The
Court approved the settlement on August 8, 2008, and ordered the *Biovail* Securities Action
closed. The claims that Biovail paid $138 million to settle were the exact opposite of, and
incompatible with, the claims Biovail was asserting against SAC in the RICO Action and
directing the assertion of in the *Del Giudice* Action.

      d.    On February 1, 2008, Biovail announced that it had been notified
by the United States Attorney's Office in Boston, Massachusetts, that it was the target of a
federal grand jury investigation in connection with activities surrounding the 2003 commercial
launch of Cardizem LA, including the PLACE Program. The U.S. Attorney's Manual defines a
target as "a person as to whom the prosecutor or the grand jury has substantial evidence linking
him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative
defendant."

      36.    Shortly thereafter, the SEC initiated a civil enforcement proceeding

against Biovail, Melnyk, and others, alleging Biovail had issued false financial statements from

2001 through 2003 that artificially inflated its stock price (the "SEC Action"[9]).  In particular, the

SEC's complaint, dated March 24, 2008, alleged, among other things, that an October 3, 2003

press release announcing third-quarter earnings was false and misleading because it did not

disclose that the Truck Accident could not have affected Biovail's quarterly earnings under

GAAP in view of the timing of the truck's departure from Biovail's distribution facility.  The

SEC Action also alleged that a March 3, 2004 press release announcing annual earnings was

false and misleading because it continued to conceal the fact that the Truck Accident revenue

loss could not have affected Biovail's third quarter earnings.  The SEC Action further alleged

that Biovail improperly shifted to PharmaTech certain research and development expenses and

thus improperly omitted them from Biovail's books and records and from its financial

statements.  These and other alleged facts regarding Biovail's fraudulent conduct were at the

very heart of the RICO Action and *Del Giudice* Action, through which Biovail alleged, or

directed the making of allegations, that Plaintiff and others falsely reported these events.

      37.    Moreover, the complaint in the SEC Action alleged "chronic fraudulent

conduct" by Biovail and described a pattern of behavior where,

> [o]bsessed with meeting quarterly and annual earning guidance, Biovail executives
> repeatedly overstated earnings and hid losses in order to deceive investors and
> create the appearance of achieving that goal.  And, when it ultimately became
> impossible to continue to conceal the Company's poor performance, Biovail
> actively misled investors and analysts as to its cause.  This corrupt strategy was
> employed by Biovail's most senior officers.

      38.    On March 24, 2008, in conjunction with the filing of its complaint, the

SEC announced that it had entered into a consent decree with Biovail settling the enforcement

proceeding, pursuant to which Biovail would, among other things, pay a $10 million penalty and

---

[9]     *SEC v. Biovail Corporation et al.*, No. 08-cv-02979 (S.D.N.Y.).

agree to accept an independent consultant to help prevent future violations of the securities laws. The SEC's enforcement proceeding against Melnyk with respect to the securities fraud allegations is continuing.

39.    Ongoing legal proceedings and developments continued to drive home the utter baselessness of Biovail's charges against SAC and others:

a.    On May 16, 2008, Biovail announced that the very subsidiary that was co-plaintiff in the RICO Action – Biovail Pharmaceuticals Inc. ("BPI") – would plead guilty to criminal charges arising out of the illegal kickback scheme otherwise disguised as the PLACE program (the "Criminal Action"[10]). In the Criminal Information dated May 19, 2008, the United States Attorney for the District of Massachusetts alleged, among other things, that the "PLACE program paid physicians [for] causing patients to fill prescriptions for Cardizem, L.A." In September 2009, BPI pled guilty and was sentenced to pay restitution, fines and assessments totaling approximately $24.7 million.

b.    Also on May 16, 2008, in the *Del Giudice* Action, the primary and local counsel for proposed lead plaintiff S. Mark Doctoroff ("Doctoroff") jointly moved to withdraw from their representations of plaintiff and the class. Counsels' motion to withdraw indicated that, in light of the $138 million settlement in the *Biovail* Securities Action, the $10 million settlement in the SEC Action, and the plea agreement in the Criminal Action, they no longer had a "reasonable belief" that the factual allegations in the *Del Giudice* Action amended complaint had evidentiary support.

c.    On January 7, 2009, Biovail entered into a settlement with the Staff of the Ontario Securities Commission (the "OSC") in connection with *In the Matter of Biovail Corporation et al.* (the "Ontario Settlement"). In the Ontario Settlement, Biovail admitted that many of the assertions contained in various analyst reports – the substance of which Biovail had originally claimed was fabricated by Plaintiff and others – were true, and therefore could not have been part of a conspiracy to drive down Biovail's share price improperly. Biovail specifically admitted, among other things, that it had improperly used PharmaTech to omit certain research and development expenses from its balance sheet and that it provided misleading information about PharmaTech to the OSC. Biovail also admitted, among other things, that its press releases attributing its missed quarterly guidance to the Truck Accident were false and misleading because the revenue in question could not have been recognized until the following quarter, and that the actual losses were $5 million, not $10 to $20 million as first reported. To settle claims with the OSC, Biovail agreed to pay an administrative penalty of CAN$5 million and an additional CAN$1.5 million in costs.

---

[10]    *United States v. Biovail Pharmaceuticals, Inc.*, No. 08-cr-10124 (D. Mass.).

### The *Del Giudice* Action is Dismissed as a Sanction for
### Numerous Violations of Rule 11

40.     On February 19, 2009, Judge Chesler dismissed the amended complaint in

the *Del Giudice* Action, without leave to replead, as a sanction for violations of Rule 11 of the

Federal Rules of Civil Procedure by proposed lead plaintiff Doctoroff and his counsel.  In

particular, the Court imposed Rule 11 sanctions against Doctoroff and his counsel for, among

other things, failing to conduct any factual investigation and filing the amended complaint with

the knowledge that its allegations were substantially based upon information Biovail obtained

through discovery in the *Biovail* Securities Action, in willful violation of a protective order

entered by Judge Richard Owen in that separate action.

41.     The Court also based its imposition of sanctions against Doctoroff on its

finding that the allegations in the *Del Giudice* Action were "incompatible with Biovail's

admission of guilt in a kickback scheme that the Amended Complaint accuse[d] [SAC and

others] of falsely reporting and with Biovail's admissions, in connection with the settlement of

the SEC enforcement action, of making false statements that inflated its stock price."[11]  By

continuing to pursue the allegations raised against Plaintiff, Doctoroff violated Rule 11 by

"insisting on a position when it bec[ame], in the course of the litigation, untenable."[12]

42.     Although Biovail was not a party to the *Del Giudice* Action, Judge

Chesler discussed its role in his findings of Rule 11 sanctions, explaining that Biovail bore

ultimate responsibility for the initiation and prolongation of the "tainted" and "untenable" *Del

Giudice* Action:

---

[11]     *Del Giudice* Opinion, Ex. A, at 21.

[12]     *Id.*

The record before the Court suggests that these proceedings and the RICO action proceedings were all part of a choreographed strategy by Biovail and its attorneys designed to constitute a counterattack against the Biovail securities action. The record demonstrates that highly experienced professionals, i.e., the attorneys who filed and pursued the Del Giudice action and the RICO action, were ready and willing tools of Biovail. They ignored their professional and ethical obligations and aided Biovail for their own benefit. The proceedings before this Court in connection with the Rule 11 sanctions motions have given the impression that all the parties to this strategy believe that they can avoid responsibility simply by pointing at each other . . . This Court refuses to accept that parties and attorneys can engage in such unabashed manipulation of our federal and state courts and yet continue to pursue a lawsuit which was filed without even the pretense of a factual investigation by the filer. Our judicial system is not quite so impotent.[13]

### Biovail Completely Abandons Its RICO Claims and the Remainder of the RICO Action is Dismissed With Prejudice

43.     On March 13, 2009, Judge Goldman of the New Jersey Superior Court repeatedly urged Biovail's counsel to dismiss the RICO Action. Biovail, ignoring Judge Chesler's finding from less than one month earlier that its allegations were "untenable," declined this invitation and insisted on continuing to prosecute the RICO Action in modified form. On April 17, 2009, Biovail filed and served a motion for leave to amend its complaint and appended a proposed second amended complaint. The second amended complaint no longer asserted causes of action under New Jersey's RICO statute, but it retained a cause of action for trade libel and disparagement, in addition to civil conspiracy, and alleged the same core "short-seller conspiracy" at the heart of the original complaint.

44.     As with the original complaint filed more than three years earlier and an intervening amended complaint filed the following year, Defendants continued to lack a reasonable, good faith belief in the facts alleged and the validity of the claims asserted in the second amended complaint, particularly in light of all the events (described herein) that had

---

[13]     *Id.* at 23-24.

come to pass; indeed, they knew the allegations to be false. Moreover, Defendants continued to use the proceedings in the RICO Action – though now bereft of all RICO claims – primarily to accomplish the improper purpose of seeking to obfuscate the truth of their own misconduct and perpetuate the fiction of the "short-seller conspiracy" at the expense of SAC and others.

45. On August 20, 2009, Judge Goldman denied Biovail leave to amend the complaint and dismissed the RICO Action with prejudice for failure to state a cause of action. Noting that trade libel claims are "potentially subject to widespread abuse," Judge Goldman concluded that the claim should be dismissed because, among other things, Biovail failed to allege it had suffered any specific special damages, a required element of trade libel in all relevant jurisdictions. Judge Goldman also dismissed the civil conspiracy cause of action, as it was derivative of the insufficiently-pled trade libel claim.

46. In reaching his conclusion as to Biovail's failure to state a cause of action, Judge Goldman rejected Biovail's contention that the law of New Jersey should apply in adjudicating the alleged causes of action, as "no link to New Jersey ha[d] been demonstrated concerning either the place of injury or actions taken within New Jersey leading to such alleged injuries."

47. Additionally, Judge Goldman concluded that, as an alternate ground for dismissing Biovail's putative second amended complaint, Biovail failed to allege adequately that New Jersey had personal jurisdiction over the claims against SAC. Judge Goldman explained that, among other things, Biovail "cited no authority for the proposition that the mere acceptance of investment capital from New Jersey residents could make a corporation subject to [New

Jersey's] jurisdiction, nor ha[d] Biovail provided any evidence to suggest that [SAC] actively solicited New Jersey investors or received any particular benefit from such investments."

## DAMAGES

48.     The allegations in the RICO Action and the *Del Giudice* Action were false and scandalous in nature, accusing Plaintiff of organized criminal activity, and they were accompanied by widespread negative publicity caused and orchestrated by Biovail with the intention of inflicting injury upon Plaintiff in the State of Connecticut and elsewhere. The complaints sought aggregate damages of approximately $18 billion, and each involved multiple defendants and a foreign forum with no connection to the parties or any of the alleged underlying events.

49.     At all times, Defendants acted without probable cause, with malicious intent unjustly to vex and trouble Plaintiff, and primarily to accomplish an improper purpose for which civil judicial proceedings are not designed. In so doing, Defendants acted with reckless indifference to the rights of SAC and others, and demonstrated an intentional and wanton violation of those rights.

50.     As a result of Defendants' conduct, Plaintiff suffered extensive damage. In addition to enormous counsel fees, Plaintiff incurred investigator fees, expert witness and consultant fees, public relations costs, and other expenses in the course of defending against these actions. Moreover, Plaintiff suffered incalculable damage to its standing in the financial services industry and overall reputation in the public domain. And Plaintiff is now incurring additional fees and costs in the course of litigating the instant matter to recover for Defendants' tortious conduct.

## COUNT I
## VEXATIOUS SUIT
## (CONN. GEN. STAT. § 52-568)

51.     Plaintiff repeats and re-alleges each allegation in Paragraphs 1 through 50 herein.

52.     Defendants commenced the RICO Action and directed the commencement of the *Del Giudice* Action by, among other things, causing service of process upon Plaintiff and Cohen, and purported service of process upon others, in the State of Connecticut without probable cause and with malicious intent unjustly to vex and trouble Plaintiff and others.  Both the RICO Action and the *Del Giudice* Action were intended to cause injury to Plaintiff and others, and did cause injury to Plaintiff and others, in Connecticut.

53.     Defendants knew at the time the RICO Action and the *Del Giudice* Action were instituted that they were based upon false allegations against Plaintiff.  Defendants lacked probable cause as they did not have a reasonable, good faith belief in the facts alleged and the validity of the claims asserted in either the RICO Action or the *Del Giudice* Action.

54.     At the time Defendants instituted the RICO Action and directed the institution of the *Del Giudice* Action, Defendants further acted with malicious intent unjustly to vex and trouble Plaintiff and for purposes other than securing a proper adjudication of the claims in the RICO Action and the *Del Giudice* Action.

55.     In instituting and directing the institution of these actions, Defendants acted with reckless indifference to the rights of SAC and others, and demonstrated an intentional and wanton violation of those rights.

56.    Without probable cause and with malicious intent unjustly to vex and trouble Plaintiff, Biovail continued the prosecution of the RICO Action until its dismissal on August 20, 2009.  The RICO Action terminated in favor of Plaintiff.

57.    Without probable cause and with malicious intent unjustly to vex and trouble Plaintiff, Biovail directed the continued prosecution of the *Del Giudice* Action until its dismissal on February 19, 2009.  The *Del Giudice* Action terminated in favor of Plaintiff.

58.    As a result of Defendants' conduct in commencing and prosecuting the RICO Action and directing the commencement and prosecution of the *Del Giudice* Action, Plaintiff has incurred, among other things, tens of millions of dollars in legal expenses and other consequential damages, damages to its reputation and financial standing, and other expenses in the course of litigating the instant matter to recover for Defendants' tortious conduct.

59.    Defendants are liable to Plaintiff for treble damages pursuant to Conn. Gen. Stat. § 52-568(2), or, in the alternate, for double damages pursuant to Conn. Gen. Stat. § 52-568(1), as a result of commencing and prosecuting these vexatious suits.  Defendants are also liable to Plaintiff for punitive damages.

## COUNT II
## ABUSE OF PROCESS

60.    Plaintiff repeats and re-alleges each allegation in Paragraphs 1 through 59 herein.

61.    Defendants initiated the RICO Action in February 2006 by, among other things, causing service of process upon Plaintiff and Cohen, and purported service of process

upon others, in the State of Connecticut. Defendants continued the prosecution of the RICO Action until its dismissal on August 20, 2009.

62.     Defendants directed the initiation of the *Del Giudice* Action in March 2006 by, among other things, causing service of process upon Plaintiff and Cohen, and purported service of process upon others, in the State of Connecticut. Defendants directed the continued prosecution of the *Del Giudice* Action until its dismissal on February 19, 2009.

63.     Both the RICO Action and the *Del Giudice* Action were intended to cause injury to Plaintiff and others, and did cause injury to Plaintiff and others, in Connecticut.

64.     Defendants did not use legal process in the RICO Action and the *Del Giudice* Action for the purpose of securing a proper adjudication of the claims therein. Rather, Defendants used legal process in these actions with malicious intent and primarily to accomplish the improper purpose of advancing their own interests in defending the wholly separate *Biovail* Securities Action and the ongoing criminal and regulatory investigations.

65.     In particular, Defendants used the proceedings in the RICO Action and the *Del Giudice* Action primarily for the improper purpose of seeking to obfuscate the truth of their own misconduct (as alleged in the *Biovail* Securities Action), to divert attention from the ongoing criminal and regulatory investigations into their fraudulent activities, and to sully SAC's reputation in the public domain. The legal proceedings used by Defendants in the RICO Action and the *Del Giudice* Action were not designed for these purposes.

66.     In misusing legal process for these improper purposes, Defendants acted with reckless indifference to the rights of SAC and others, and demonstrated an intentional and wanton violation of those rights.

67.     As a result of Defendants' conduct in commencing and prosecuting the RICO Action and directing the commencement and prosecution of the *Del Giudice* Action, Plaintiff has incurred, among other things, tens of millions of dollars in legal expenses and other consequential damages, damages to its reputation and financial standing, and other expenses in the course of litigating the instant matter to recover for Defendants' tortious conduct.

68.     Defendants are liable for consequential and punitive damages as a result of their abuse of process.

### PRAYER FOR RELIEF

Wherefore, Plaintiff prays that this Court grant the following relief:

a.     Judgment in favor of Plaintiff that Defendants engaged in vexatious suits, Conn. Gen. Stat. § 52-568, by causing the RICO Action and the *Del Giudice* Action to be commenced, prosecuted, and continued without probable cause and with malicious intent unjustly to vex and trouble Plaintiff and by causing service of process to be made upon Plaintiff in the State of Connecticut;

b.     Judgment in favor of Plaintiff that Defendants engaged in abuse of process by causing the RICO Action and the *Del Giudice* Action to be commenced, prosecuted and continued primarily to accomplish a purpose for which civil judicial proceedings are not designed and by causing service of process to be made upon Plaintiff in the State of Connecticut;

c.     Damages consisting of all costs and expenses incurred by Plaintiff in connection with defending the RICO Action and the *Del Giudice* Action;

d.     Double damages for Defendants' causing of the commencement and prosecution of the RICO Action and the *Del Giudice* Action without probable cause, pursuant to Conn. Gen. Stat. § 52-568(1);

e.     Treble damages for Defendants' causing of the commencement and prosecution of the RICO Action and the *Del Giudice* Action without probable cause and with malicious intent unjustly to vex and trouble Plaintiff, pursuant to Conn. Gen. Stat. § 52-568(2);

f.     Punitive damages as a result of Defendants' reckless indifference to the rights of Plaintiff, and intentional and wanton violation of those rights, by causing the institution and prosecution of the RICO Action and the *Del Giudice* Action;

g.     Pre-judgment and post-judgment interest, as well as its reasonable attorneys' fees and costs in the instant action; and,

h.     Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated: Stamford, Connecticut
       February 17, 2010

McCARTER & ENGLISH, LLP

By: _____
Charles T. Lee (ct 00297)
Joseph J. Cherico (ct 24869)
Jennifer Black Strutt (ct 26648)
Canterbury Green
201 Broad Street, 9th Floor
Stamford, CT 06901
Telephone: (203) 399-5921
clee@mccarter.com
jcherico@mccarter.com
jstrutt@mccarter.com

*Attorneys for S.A.C. Capital Advisors, LLC*

Of Counsel:

WILLKIE FARR & GALLAGHER LLP
Martin Klotz
Brian Faerstein
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
mklotz@willkie.com
bfaerstein@willkie.com

# EXHIBIT A

<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| GUY DEL GIUDICE, individually and on behalf of all those similarly situated , | : | |
| | : | **Civil Action No. 06-1413 (SRC)** |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| S.A.C. CAPITAL MANAGEMENT, LLC, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**CHESLER**, District Judge

      This matter comes before the Court upon various motions for sanctions pursuant to

Federal Rule of Civil Procedure 11 against three attorneys and against the Lead Plaintiff S. Mark

Doctoroff ("Doctoroff") personally.  The attorneys against whom sanctions are sought are

Thomas Gentile ("Gentile"), attorney for captioned plaintiff Guy Del Giudice ("Del Giudice"),

Lead Counsel William B. Federman ("Federman") of the law firm of Federman Sherwood and

Liaison Counsel Evan J. Smith ("Smith") of the law firm of Brodsky & Smith.  The primary

motion for Rule 11 sanctions against these attorneys was filed by Defendants Banc of America

Securities LLC ("BAS") and David Maris ("Maris"), a former BAS analyst [docket item no.

108].  Four separate "me too" motions for sanctions against the attorneys followed: by the

"S.A.C. Defendants"[1] [docket item no. 111]; by Defendants Arthur Cohen and Joseph Healey

[docket item no. 113]; by the "Gradient Analytics Defendants"[2] [docket item no. 114]; and by

Defendant Timothy McCarthy [docket item no. 118].[3]   The primary motion for Rule 11

sanctions against Doctoroff was also filed by BAS and Maris [docket item no. 125], with

separate motions for sanctions against Doctoroff filed by the S.A.C. Defendants [docket item no.

130]; by the Gradient Analytics Defendants [docket item no. 127]; by Cohen and Healey [docket

item no. 138]; and by McCarthy [docket item no. 134].   All of these motions have been opposed.

In addition, Lead Counsel Federman Sherwood and Liaison Counsel Brodsky & Smith have

moved to withdraw as counsel for the Lead Plaintiff [docket item no. 107].

The Court held oral argument on January 20, 2009.   The Court has considered the papers

filed and the arguments made by the attorneys against whom sanctions are sought and by Lead

Plaintiff Doctoroff, through his individual counsel, Louis R. Miller of the firm Miller Barondess,

appearing for Doctoroff in connection with the sanctions motion.   For the reasons discussed

below, the Court sanctions Federman, Smith and Doctoroff and accordingly will dismiss the First

Amended Class Action Complaint ("Amended Complaint") without prejudice.

---

[1] The "S.A.C. Defendants" are S.A.C. Capital Management, LLC; S.A.C. Capital Advisors, LLC; S.A.C. Capital Associates, LLC; Sigma Capital Management, LLC; S.A.C. Healthco Fund, LLC; and Steven A. Cohen.

[2] The "Gradient Analytics Defendants" are Gradient Analytics, Inc.; Camelback Research Alliance, Inc.; James Carr Bettis; Donn Vickrey; Pinnacle Investment Advisors, LLC; and Helios Equity Fund, LLC.

[3] The Court notes that the motions filed by Cohen and Healey, by the Gradient Analytics Defendants and by McCarthy state that they seek sanctions against Del Giudice, Gentile's client, rather than Gentile himself.   As the Court reads these movants' papers, the Gradient Analytics Defendants in fact seek sanctions against Gentile, and the other motions fail to specify how or on what basis Del Giudice should be sanctioned.

## I.   BACKGROUND

The motions for Rule 11 sanctions revolve around the behind-the-scenes conduct of a

non-party to this case - Biovail Corporation ("Biovail"), a Canadian pharmaceutical company,

whose stock price is at the heart of this securities fraud action and two other civil actions.  The

action at bar was filed on March 24, 2006 in the District of New Jersey by Guy Del Giudice on

behalf of a putative class of sellers of Biovail stock against various hedge funds and securities

analysts alleging claims for violations of Sections 10(b) and 20(a) of the Securities Exchange

Act.  The Complaint alleged that Defendants[4] drove down the price of Biovail stock throughout

2003 by disseminating false information about Biovail's products and its business and

accounting practices, including the publication of articles falsely implying that Biovail had bribed

doctors to prescribe its newly launched blood pressure medication Cardizem LA.  (This action

will hereinafter be referred to as the "Del Giudice action.")  The two other civil lawsuits closely

related to the Del Giudice action were pending when the action at bar was filed.  First-filed, in

2003, was a securities fraud class action by Biovail shareholders against Biovail in the Southern

District of New York, alleging that the Biovail stock price drop in 2003 was caused by Biovail's

artificial inflation of the stock price through market misrepresentations and accounting fraud.

(This action will hereinafter be referred to as the "Biovail securities action.")  The Honorable

Richard Owen presided over the Biovail securities action at all times relevant to the motions at

bar.  Later, on or about February 22, 2006, Biovail filed in New Jersey state court an action

---

[4] When referring to all Defendants generally, the Court will use the collective label
"Defendants."

against largely the same defendants who would be named in the Del Giudice action,[5] alleging a short-selling conspiracy in violation state RICO laws. (This action will hereinafter be referred to as the "RICO action.")  Complicit in Biovail's manipulation and abuse of the judicial system are the Lead Plaintiff, Doctoroff, and three of the attorneys appearing in the New Jersey securities action before this Court.  While this Court deals here only with the misconduct of these individuals with respect to the action at bar, exposing the improper nature of the pleadings they have filed in this action requires an overview of events relating to all three lawsuits.

The Court begins, as it must, with Judge Owen's entry of a stipulated protective order in the Biovail securities action on April 29, 2005 (the "Owen protective order").  The Owen protective order barred the parties to the Biovail securities action from using documents, materials or information covered by the order for any purpose other than the prosecution or defense of the Biovail securities action.  Pursuant to the Owen protective order, Biovail obtained by subpoena thousands of documents from BAS. On February 22, 2006, Biovail filed the RICO action, basing many allegations in that complaint on information supplied in the documents BAS produced under the Owen protective order.  About a month later, Gentile, attorney for plaintiff shareholder Del Giudice filed the Complaint in this action.  The Complaint parroted the RICO action complaint almost verbatim, adding a federal securities fraud claim.  Indeed, the Complaint stated that its was "[b]ased on the facts set forth in the publicly filed complaint in *Biovail v. S.A.C.* [the RICO action]."

---

[5] Notably, however, BAS itself was not named a defendant in the RICO action but its analyst Maris was.

While the Del Giudice action remained mostly dormant for the remainder of 2006, important developments were occurring in the Biovail securities action. BAS alerted Judge Owen to Biovail's use of the confidential documents in drafting and filing the RICO action complaint. In a written opinion and order dated January 26, 2007, Judge Owen found that Biovail had willfully violated the protective order by using BAS's documents to draft its RICO claims. In addition to ordering the return of the BAS documents, Judge Owen ordered Biovail to redact from the RICO complaint any allegation referencing a confidential BAS document or based on information solely derived from documents covered by the Owen protective order. Judge Owen specifically notified this Court of his determination that Biovail's RICO complaint was a product of Biovail's violation of the protective order and urged this Court "consider appropriate steps to protect [BAS]" from injury by further misuse of any of these documents or the information of which they are the sole source." (5/22/08 English Decl., Ex. B.) (The Court will refer to Judge Owen's January 26, 2007 order as the "Owen sanctions order.")

Promptly after Owen sanctions order was issued, counsel for BAS, on behalf of all Defendants in the Del Giudice action, wrote to Gentile, who had filed the initial Complaint on behalf of Del Giudice, and to Federman and Smith, who had been appointed Lead Counsel and Liaison Counsel, respectively, for Lead Plaintiff Doctoroff.[6] Defendants' January 30, 2007 letter

---

[6] Though this securities fraud action was initiated by Del Giudice, he did not seek appointment as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). (The PSLRA, which applies to private actions brought under the Securities Exchange Act, such as the Del Giudice action, establishes a procedure for the appointment of a lead plaintiff in private class action suits. 15 U.S.C. § 78u-4(a)(3).) By Order dated June 26, 2006, the Court appointed S. Mark Doctoroff as Lead Plaintiff for the Class, pursuant to the PSLRA. It also approved the law firm Federman Sherwood as Lead Counsel for the Class and the firm Brodsky & Smith as Liaison Counsel for the Class.

advised counsel of Judge Owen's findings and included a copy of the Owen sanctions order. The letter pointed out that, as the document itself indicates, the Complaint in the Del Giudice action is based on the RICO complaint Judge Owen had found offended his protective order. Defendants accused Gentile, Federman and Smith of violating their Rule 11 obligations and, citing the tainted nature of the Complaint's allegations, demanded immediate withdrawal of the Complaint. The Complaint was not withdrawn. Instead, on January 31, 2007, Lead Plaintiff, through his counsel Federman and Smith, filed the Amended Complaint. The Amended Complaint amplified its allegations to charge some additional wrongdoing but retained the original Complaint's allegations regarding Defendants' hand in driving down the price of Biovail stock through deliberate dissemination of misinformation.

On February 5, 2007, this Court held a telephone conference on the record to address the Owen sanctions order. The Court ordered the Lead Plaintiff to demonstrate the source of information for all allegations of the Amended Complaint. The Court ordered Plaintiff "in particular, [to] demonstrate that the source for those allegations was not tainted by a violation of Judge Owen's protective order in his Biovail case." (5/22/08 English Decl. Ex. C, at 18:22-24.) These directives were memorialized in the Court's Order entered on the docket on February 26, 2007 [docket item no. 69].

In response, Doctoroff conceded that "[t]he substantive allegations of the original Complaint are based almost exclusively on the complaint filed by Biovail in [the RICO action]. Thus, a substantial portion of the allegations of the Amended Complaint are derived from the Biovail Complaint [in the RICO action] . . . ." (Plaintiff's Response to Court's February 26, 2007 Order, at 3-4. [docket item no. 88]) In his submission to the Court, Lead Plaintiff cited

Biovail's RICO complaint as a source of 128 of the Amended Complaint's 143 paragraphs containing factual allegations and the sole source for 88 of those allegations. Lead Counsel and Liaison Counsel defended the propriety of the Amended Complaint by distinguishing their role in this action from Gentile's: he filed the initial Complaint, allegedly without investigation, whereas Doctoroff and his counsel had become involved in the case at a later time pursuant to the PSLRA lead plaintiff provisions. They maintained that all the information underlying the Amended Complaint was in the public domain - by virtue of press releases and news reports as well as by virtue of the pleadings filed in the Biovail securities action and the RICO action - and that Doctoroff was therefore free to prosecute the Del Giudice action on that basis. Doctoroff and Class Counsel stated, moreover, that many of the Amended Complaint's allegations do not concern BAS or Maris, and therefore do not implicate the Owen protective order in any way. Those that do are salvaged, according to Doctoroff's response, because the RICO action complaint was a matter of public record.

While the justification of this action was being developed, Judge Owen had initiated a hearing in the New York securities action sparked, at least in part, by knowledge that Biovail was seeking to obtain through subpoena in the RICO action the documents that Judge Owen had ordered returned. The nine-day evidentiary hearing he conducted revealed further information about how the confidential information from the BAS documents came to appear in the Del Giudice Complaint. In relevant part, the hearings confirmed that the Complaint was not prepared by Del Giudice's attorney, Gentile, but rather it was drafted by Biovail's counsel at Biovail's. Biovail's counsel, moreover, identified a shareholder to serve as the plaintiff in the Del Giudice action. They sent Gentile the Complaint, which Gentile filed hours after receiving it via e-mail,

without meeting his Biovail-selected client, reviewing documents underlying the Complaint or

interviewing witnesses regarding the conduct alleged. The Del Giudice Complaint was the first

securities fraud class action complaint Gentile had ever filed. Gentile admitted he made no

substantive changes to the document he received, other than to remove a reference to an

investigation on which the allegations were based. He further admitted that he learned after

filing the pleading that the Complaint was based on documents subject to the protective order

and that had he known that at the time, he would not have filed the Complaint.

Federman and Smith, in their brief in opposition to the sanctions motions, stress the

contrast between Gentile's pre-filing conduct and the investigation they conducted before filing

the Amended Complaint. They state that they conducted extensive internet research to learn as

much as possible about the facts underlying the Complaint, and they also reviewed the RICO

action complaint and documents electronically filed in connection with that action (which had

been removed to this Court, but has since been remanded). They detail a meeting between

Federman and Stuart W. Emmons, both of the Federman Sherwood law firm, and Biovail's

counsel, Kasowitz, Benson, Torres & Friedman, LLP (the "Kasowitz firm") at the Kasowitz

firm's New York office on September 20, 2006. During this meeting, which lasted several hours,

and in a subsequent telephone conversation, Lead Counsel and Biovail's counsel discussed their

cases. Biovail's counsel represented to Lead Counsel that the allegations of a short-seller

conspiracy set forth in the RICO action complaint were the product of a 16-month investigation

by the Kasowitz firm. While they discussed the findings of the investigation and the evidence

relating to some of the Defendants, they did not discuss the evidence underlying the allegations

against BAS and Maris. Biovail's counsel explained to Federman and Emmons that most of the

factual allegations in the RICO complaint against BAS and Maris were derived from documents

produced by BAS in the Biovail securities action pursuant to a protective order. Thus, the

attorneys agreed not to discuss the documents, and Biovail's counsel informed Federman and

Emmons that they could not turn over a copy of those documents. Additionally, with respect to

pre-filing investigation, Federman's and Smith's brief points to two media reports: a segment

that aired on the televison program "60 Minutes" on March 26, 2006 regarding the alleged short-

seller conspiracy against Biovail and a March 26, 2006 New York Times Article. The "60

Minutes" piece focused on information provided by three former employees of Camelback, a

stock analysis firm now known as Gradient Analytics (a Defendant in this action); the New York

Times article included information provided by the former Camelback employees and by the

allegations of the RICO action complaint.

     In or about September 2007, shortly after the conclusion of Judge Owen's hearing,

Biovail agreed to release BAS and Maris from all claims that arose or could arise from the BAS

documents covered by the Owen protective order. Biovail withdrew its claims against BAS and

Maris in the New Jersey RICO action. In or about December 2007, Biovail settled the Biovail

securities action,[7] and then months later settled a similar securities fraud class action in Canada.

     On March 24, 2008, the SEC commenced a civil enforcement action against Biovail and

officers of the company alleging that Biovail had, among other things, filed false financial

statements over the period of 2001 to 2003 and artificially inflated its stock price. The same day,

the SEC announced that Biovail had entered into a consent decree agreeing to pay a $10 million

---

[7] On December 11, 2007, plaintiffs' attorneys in the New York securities action announced that Biovail had agreed to pay $138 million to settle the case.

fine to settle the charges. Finally, on May 16, 2008, Biovail announced it had agreed to plead guilty to criminal charges of paying doctors in 2002 and 2003 to buy Cardizem and to pay a $24.6 million fine in connection with that charge.

On April 25, 2008, Defendants BAS and Maris served upon Gentile, Federman and Smith a motion for Rule 11 sanctions. Their letter addressed to Federman, and copied to Smith, Gentile and other counsel, specifically advised that BAS and Maris took the position that Gentile, Federman and Smith had violated Rule 11 and notified that unless the Amended Complaint was withdrawn by May 16, 2008 (21 days from the date of the notice), BAS and Maris would file a motion for Rule 11 sanctions. Lead Plaintiff Doctoroff and his counsel did not voluntarily dismiss the Amended Complaint. Instead, on May 16, 2008, Lead Counsel Federman and Emmons, from the law firm of Federman Sherwood, and Liaison Counsel Smith, of the firm Brodsky & Smith, filed a motion to withdraw as counsel. (A corrected version of the motion was filed on May 22, 2008 and appears on the docket as item number 107.) According to the attorneys seeking leave to withdraw, their motion "was precipitated by a difference of opinion between Counsel and Lead Plaintiff as to the best way to proceed in this action at this time in light of the recent developments." (Federman Opp. Br. at 13 n. 5.) In particular, Federman Sherwood and Brodsky & Smith assert that since BAS and Maris gave them notice of their intent to file a motion for Rule 11 sanctions, and following Biovail's settlement of civil and criminal enforcement actions as detailed above, they "did not advocate and have not advocated the factual contentions of the Amended Complaint." (Id. at 14.) Neither Lead Plaintiff Doctoroff or other counsel have opposed the withdrawal motion.

On May 22, 2008, 27 days after they served counsel with the proposed motion, BAS and Maris filed their Rule 11 motion with the Court. The other motions for Rule 11 sanctions against counsel were filed thereafter, following notice to Doctoroff and counsel as required by Rule 11.

On June 6, 2008, BAS and Maris served on Doctoroff a separate motion for Rule 11 sanctions against him personally. Defendants later filed the various motions pertaining to Doctoroff. Doctoroff secured his own counsel to defend against the Rule 11 sanctions motions against him. He believes the case has merit and wishes to continue to prosecute the claim as Lead Plaintiff.

The Court held oral argument on the motions on January 20, 2009. At the argument, counsel arguing on behalf of Federman and Smith acknowledged that while they wished to withdraw the Amended Complaint following service of the sanctions motion, their client Doctoroff disagreed. Lead Counsel and Liaison Counsel felt that in light of Biovail's admissions of wrongdoing in the SEC enforcement action and guilty plea in a criminal action (both actions premised on Biovail's inflation of its stock price and its payment of kickbacks to physicians for prescribing Cardizem LA) the allegations of the lawsuit at bar (premised on deflation of the stock by hedge funds and analysts by, among other things, publishing false reports of this kickback scheme) could not be pursued. Doctoroff argued that he nevertheless continues to believe in the merits of the case and requested that the Court not dismiss the action but rather allow him and new counsel - who would move to be appointed Lead Counsel - an opportunity to file a second amended complaint.

## II.    DISCUSSION

Defendants' motions for sanctions pursuant to Rule 11 concern three targets: counsel for Del Giudice (Gentile) who filed the initial Complaint but did not become Lead Counsel and did not file the operative Amended Complaint; Lead Counsel and Liaison Counsel for Lead Plaintiff Doctoroff (Federman and Smith, respectively); and Lead Plaintiff Doctoroff. The Court will impose sanctions against Federman, Smith and Doctoroff. It finds that the present posture of the action will not, however, support Rule 11 sanctions against Gentile. Following a brief overview of the jurisprudence governing Rule 11 sanctions, the Court will give its reasons.

### A.    Federal Rule of Civil Procedure 11

Rule 11 imposes an affirmative duty on an attorney and/or a party to conduct a reasonable inquiry into the factual and legal bases of all claims before filing any document with the court. Business Guides, Inc. v. Chromatic Commc'ns Enters., Inc., 498 U.S. 533, 551 (1991); Bensalem Twp. v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303, 1314 (3d Cir. 1994). In relevant part, Rule 11 provides:

> (b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

> (3) the factual contentions have evidentiary support or, if specifically so
> identified, will likely have evidentiary support after a reasonable
> opportunity for further investigation or discovery . . .

FED. R. CIV. P. 11(b)(1)-(3).

In determining whether a party or attorney has violated the duties of Rule 11, the Court

must apply an objective standard of reasonableness under the circumstances. Mary Ann

Pensiero, Inc. v. Lingle, 847 F.2d 90, 92 (3d Cir.1988); see also Brubaker Kitchens, Inc. v.

Brown, 280 F. App'x 174, 185 (3d Cir. 2008) ("It is well-settled that the test for determining

whether Rule 11 sanctions should be imposed is one of reasonableness under the circumstances,

the determination of which falls within the sound discretion of the District Court."). The Third

Circuit has held that "[a]n inquiry is considered reasonable under the circumstances if it provides

the party with "an 'objective knowledge or belief at the time of the filing of a challenged paper'

that the claim was well-grounded in law and fact." Bensalem Twp., 38 F.3d at 1314.

The reasonable inquiry requirement does not prevent an attorney from relying on

representations made by another person. Garr v. U.S. Healthcare, Inc., 22 F.3d 1274, 1278 (3d

Cir. 1994). Indeed, because a court must consider all material circumstances in evaluating the

reasonableness of the inquiry, a court's determination of whether an attorney has conducted a

reasonable inquiry may depend on whether the attorney necessarily depended on information

supplied by another person. Id. at 1278-79. A filing attorney, however, may not rely solely upon

the inquiry conducted by another attorney, as the Rule 11 duty of investigation is personal and

non-delegable. Pavelic & LeFlore v. Marvel Entm't Group, 493 U.S. 120, 126-27 (1989); Garr,

22 F.3d at 1278, 1280; Greenfield v. U.S. Healthcare, Inc., 146 F.R.D. 118, 124 (E.D.Pa. 1993),

aff'd sub nom. Garr v. U.S. Healthcare, Inc., 22 F.3d 1274 (3d Cir. 1994).  Whether an attorney's

inquiry was reasonable may also depend on the time available to investigate the facts and law.

Garr, 22 F.3d at 1279.  An attorney with ample time to file a document may be expected to

conduct a more thorough inquiry than an attorney working under pressing time constraints.  Id.

Other factors that a court may consider in evaluating the reasonableness of the investigation

required by Rule 11 are the necessity for reliance on a client for the underlying factual

information, the plausibility of the legal position advocated and whether the case was referred to

the signer by another member of the Bar.  Mary Ann Pensiero, Inc., 847 F.2d at 95.

Rule 11 authorizes a court "to impose an appropriate sanction" on an attorney and/or

party found to have violated the obligations of the rule.  FED. R. CIV. P. 11(c)(1).  In this way, the

rule seeks "to curb abusive litigation tactics and misuse of the court's process."  Gaiardo v. Ethyl

Corp., 835 F.2d 479, 482 (3d Cir. 1987).  The sanction "must be limited to what suffices to deter

repetition of the conduct or comparable conduct by others similarly situated."  FED. R. CIV. P.

11(c)(4).  Appropriate sanctions may include directives of a non-monetary nature, orders to pay a

penalty into court, an award of attorneys' fees and costs, or even dismissal of a case.  FED. R.

CIV. P. 11(c)(4); Gaiardo, 835 F.2d at 482; Greenfield, 146 F.R.D. at 129.

The matter of Rule 11 violations by a party and/or attorney may be raised by the Court on

its own initiative or by motion.  FED. R. CIV. P. 11(c)(2) and (3).  If a party chooses to bring a

motion for sanctions under Rule 11, it must first serve the motion on the party and/or attorney

against whom sanctions are sought and then wait at least 21 days after service before filing the

motion with the court.  FED. R. CIV. P. 11(c)(2).  This "safe-harbor" provision of Rule 11 permits

the allegedly offending party or attorney an opportunity to withdraw the challenged pleading.  Id.

**B.    Thomas Gentile**

Exercising its discretion, the Court will not impose sanctions on Gentile.  The Complaint

he filed is no longer controlling in this case, as it has been superseded by the Amended

Complaint filed on January 31, 2007 by other attorneys.  Gentile's client, Del Giudice, is not the

Lead Plaintiff in this putative class action, and Gentile is not an attorney for the putative class.

Gentile had no real opportunity to correct the wrongdoing of which the movants complain.  He

cannot withdraw the offending document - the Amended Complaint - because neither he nor his

client filed it, and the document Gentile did file on behalf of Del Giudice - the Complaint - has

not been operative since January 31, 2007.  The Court finds that imposing sanctions on Gentile in

spite of the impossibility of any corrective action on his part in response to Defendants' notice

that they would seek Rule 11 sanctions would render the mandatory safe harbor provision of

Rule 11 without force or effect.  Indeed, the rule forecloses a motion for sanctions if the

offending party or attorney withdraws or corrects the challenged paper, claim, defense,

contention or denial within the 21-day safe harbor period.  In re Shaefer Salt Recovery Inc., 542

F.3d 90, 99 (3d Cir. 2008).  A corollary principle of the mandatory safe harbor provision holds

that "a Rule 11 motion cannot be made unless there is some paper, claim, or contention that can

be withdrawn." Ridder v. Springfield, 109 F.3d 288, 296 (6th Cir. 1997).  Thus, where as here, it

is too late for the offending party to withdraw the challenged paper, because it has become

inoperative, no sanctions under Rule 11 may issue.  Id. at 296-97; see also Barber v. Miller, 146

F.3d 707, 710 (9th Cir. 1998) (denying Rule 11 sanctions motion where offending complaint had

long been dismissed, reasoning that imposing sanctions when offending party had no opportunity

to withdraw claim would defeat purpose of rule's safe harbor).

The Court does not intend to communicate or in any way suggest that Gentile's conduct in connection with filing the Complaint passes muster under Rule 11. Clearly, it does not. Gentile admittedly failed to conduct any independent investigation at all before filing the Complaint in this action - much less a "reasonable inquiry" of the facts alleged in support of the securities fraud claims asserted. See Garr, 22 F.3d at 1280 (finding that attorneys who filed a complaint that replicated two other securities class action complaints violated Rule 11 by failing to examine materials underlying their complaint's allegations and claims). He hastily filed the pleading he had no role in drafting, with no justifiable reason to rush. See id. (observing that time available to investigate the facts and law bears on the reasonableness of the inquiry). Gentile conceded that had he known that the Complaint delivered to him by Biovail's attorneys asserted allegations derived from documents covered by another federal court's protective order, he would not have filed the Complaint that initiated the action at bar.

In short, in light of Gentile's inability to take advantage of the protection offered by Rule 11's safe harbor, the Court holds that the Rule 11 motion for sanctions against him must be denied.

## C.    William Federman and Evan Smith

There is no dispute that Federman and Smith copied the RICO complaint's factual allegations and filed the Amended Complaint without personally investigating the basis for the allegations. They themselves identify the RICO action complaint as the sole source of more than half of the Amended Complaint's factual allegations. Their pre-filing investigation consisted of discussions with Biovail's attorneys about the RICO case, on which the instant securities lawsuit was modeled. Federman and Smith admittedly did not review the documents on which the

allegations against BAS and Maris were based because, as Federman and Smith explain,

Biovail's counsel advised Lead Counsel that those documents were produced by BAS in the New

York securities action pursuant to a protective order.  The Third Circuit has held that the attorney

signing a pleading "has a 'personal, nondelegable responsibility' to comply with the requirements

of Rule 11".  Garr, 22 F.3d at 1278 (quoting Pavelic & LeFlore, 493 U.S. at 126).  One attorney

cannot rely solely on another's pre-filing investigation.  Id. at 1277-79.

Filing the Amended Complaint, which alleges securities fraud, in reliance on the

investigation presumably conducted by Biovail's attorneys in connection with Biovail's RICO

action suffices on the facts of this case to draw sanctions.  Pavelic & Le Flore, 493 U.S. at 125-

26;  Garr, 22 F.3d at 1280.  Indeed, in Greenfield, the United States District Court for the Eastern

District of Pennsylvania found the pre-filing inquiry of two attorneys, who had relied on the

investigation conducted by another attorney and on one Wall Street Journal article before filing a

complaint on behalf of Scott and Patricia Garr, to be unreasonable for purposes of their Rule 11

duties.  Greenfield, 146 F.R.D. at 126-27.  As in this case, the attorneys who breached Rule 11

had copied the complaint they filed for the Garr plaintiffs from a complaint prepared and filed in

a separate lawsuit by another attorney.  Id. at 121.  One of the sanctions the district court imposed

was to dismiss the Garr complaint without prejudice.  Id. at 129.  On appeal, the Third Circuit

affirmed.  Garr, 22 F.3d at 1280.

The misconduct by Federman and Smith, however, goes beyond their lack of a reasonable

independent investigation.  Knowing that the RICO complaint was drafted by Biovail's attorneys

in willful violation of Judge Owen's protective order, Federman and Smith nevertheless

proceeded to file the Amended Complaint.  By letter dated January 30, 2007, counsel for BAS

and Maris advised them of Judge Owen's ruling with regard to Biovail's misuse of the

information obtained in the Biovail securities action before him and even included a copy of the

Owen sanctions order with their letter to Doctoroff's counsel.  The Owen sanctions order

unequivocally censures Biovail's conduct, orders it to redact from the RICO action complaint

allegations solely based on Biovail's violation of the protective order and identifies the Del

Giudice action as similarly tainted in that it mirrors the RICO action complaint.  Apparently,

Federman and Smith, and their client Doctoroff, believed this Court would countenance the

prosecution of claims based on information made public as a result of a deliberate violation of

another court's order.  They were wrong.

      Counsel defends the filing of the Amended Complaint on the absurd ground that the

claims and allegations are derived from information in the public domain by virtue of the RICO

complaint.  This argument insults this Court and, moreover, mocks the judicial system.  When

they filed the Amended Complaint with this Court, they were fully aware of the Owen sanctions

order.  When pressed by this Court to identify with regard to each of the Amended Complaint's

allegations a source of information with no connection to the RICO complaint, Lead Plaintiff and

his counsel were simply unable to do so.

      The Rule 11 violation committed by Federman and Smith was complete when they filed

the Amended Complaint.  Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 395 (1990).  It has

not been cured.  They make a belated attempt to rectify the wrong by arguing that, in what

represents an insurmountable difference of opinion with their client Doctoroff, they have ceased

to advocate the Amended Complaint's claims following Biovail's settlement of civil enforcement

proceedings by the SEC and its guilty plea to criminal charges and, accordingly, have moved to

withdraw as Doctoroff's counsel. This assertion, without a corresponding withdrawal of the offending document, does not expunge their initial wrongdoing in filing the Amended Complaint and, indeed, their ongoing wrongdoing in continuing to press claims based on tainted allegations long after the Owen sanctions order. Counsel's insinuation that their hands are tied with regard to their ability to take corrective action, due to their disagreement with their client as to how to proceed, is similarly unavailing. See, e.g., Gold v. The Last Experience, No. 97 Civ. 1459, 1999 WL 156005, at *4 (S.D.N.Y. Mar. 22, 1999) (imposing Rule 11 sanctions on withdrawing plaintiff's attorney following failure to withdraw lawsuit after receiving adequate safe-harbor notice, finding that withdrawal as counsel did not absolve attorney of liability under Rule 11). No authority has been presented to this Court under which counsel might be protected from sanctions without taking the corrective action contemplated by Rule 11a's safe harbor.

Apart from clearly failing to investigate the factual allegations themselves, Federman and Smith scoffed at the authority of the United States District Court for the Southern District of New York. This abuse of the judicial process falls squarely within the conduct Rule 11 prohibits and seeks to deter by authorizing sanctions. Teamsters Local Union No. 430 v. Cement Express, Inc., 841 F.2d 66, 68 (3d Cir.1988) (holding that Rule 11 sanctions are appropriate "only if the filing of the complaint constituted abusive litigation or misuse of the court's process."). This Court believes that any sanction short of dismissing the Amended Complaint without prejudice would reward their misconduct. As will be discussed in more detail below, Doctoroff is equally culpable under Rule 11, particularly in light of his adherence to the Amended Complaint. His refusal to permit counsel to withdraw that pleading within the safe harbor period demonstrates a continuing violation of Rule 11. Thus, the Court finds that the embarrassing conduct of the

attorneys together with Lead Plaintiff's abdication of his responsibilities to the class, under the

PSLRA, and to this Court as a litigant, warrant dismissal of the Amended Complaint.

Accordingly, the Court will grant Defendants' motions for Rule 11 sanctions insofar as

they target Lead Counsel Federman and Liaison Counsel Smith. The Court will order dismissal

of the Amended Complaint without prejudice as the appropriate sanction.

### D.    Doctoroff

Parties, not just their attorneys, are bound by the obligations of Rule 11 and may likewise

be sanctioned for a breach of those obligations. FED. R. CIV. P. 11(c)(1); Business Guides, Inc.,

498 U.S. 533, 541 (1991); Cohen v. Kurtzman, 45 F.Supp.2d 423, 436-37 (D.N.J. 1999)

(sanctioning attorney and client for failure to conduct reasonable pre-filing investigation). Under

the rule, as amended in 1993, signature on a pleading is not the sole trigger of the rule's

obligations. It states that the attorney or party makes certain representations to the Court "[b]y

presenting to the court a pleading, written motion or other paper – *whether by signing filing*

*submitting, or later advocating it* . . . . " FED. R. CIV. P. 11(b) (emphasis added). Doctoroff's

argument that he should not be sanctioned because he did not sign the Amended Complaint is

therefore unavailing.[8] For the same reasons discussed above with respect to his counsel,

Doctoroff, as the proponent of the Amended Complaint, is liable for the same lack of adequate

pre-filing investigation and prosecution of claims he knows are based on a deliberate violation of

Judge Owen's protective order.

---

[8] The Court notes that the Third Circuit cases he cites in support of his position that a
signature is required before Rule 11 may apply all pre-date the 1993 amendment. See, e.g.,
Gaiardo, 835 F.2d at 484  ("The rule focuses on the act of signing the document as a certification
. . .").

Doctoroff's continuing prosecution of the Amended Complaint - exemplified by his refusal to withdraw the pleading as urged by Lead Counsel and Liaison Counsel - perpetuates the Rule 11 violation. Rule 11 does not apply only at the filing stage. It prohibits a party from insisting on a position when it becomes, in the course of the litigation, untenable. Balthazar v. Atl. City Med. Ctr., 137 F. App'x 482, 490 (3d Cir. 2005) (citing FED.R.CIV.P. 11, Advisory Committee Note). On this point, the Sixth Circuit has held that "[a]n attorney and the litigant have continuing obligation to review and reevaluate their pleadings, motions and other papers and upon discovery that such papers were without merit, to immediately dismiss the action at the risk of inviting the imposition of Rule 11 sanctions." Herron v. Jupiter Transp. Co., 858 F.2d 332, 336 (6th Cir. 1988). As detailed above, the factual allegations of the Amended Complaint have a tainted origin and, as events following its filing confirm, are incompatible with Biovail's admission of guilt in a kickback scheme that the Amended Complaint accuses Defendants of falsely reporting and with Biovail's admissions, in connection with the settlement of the SEC enforcement action, of making false statements that inflated its stock price.

Moreover, as Lead Plaintiff in this action, Doctoroff bears a fiduciary obligation to the class. In re Cendant Corp. Sec. Litig., 404 F.3d 173, 198 (3d Cir. 2005) (holding that in a PSLRA action, "the lead plaintiff serves as a fiduciary for the entire class."). His position with respect to the validity of the claims he wishes to prosecute as Lead Plaintiff runs afoul of that obligation. Though Doctoroff states that he continues to believe in the claims, he does not explain how he has come to the conclusion that they have merit. When he became involved in the case, and agreed to seek the Court's approval to act as the Lead Plaintiff, he relied only on

Federman Sherwood's description of the case and his attorneys' representations about the merits

of the claims.  Now, after those same attorneys have taken the position that the claims are no

longer valid and have so advised Doctoroff, Doctoroff continues to advocate the claims without

suggesting that he has exercised his fiduciary responsibility to determine, based on his own

investigation, that the claims have continuing validity.

Only at oral argument does Doctoroff suggest that perhaps the claims, as pled in the

Amended Complaint, lack merit, as indicated by his request that the Amended Complaint be

dismissed with leave of the Court to file a further amended pleading.[9]  Doctoroff's representation

that he wishes to proceed with the case on a different complaint seems to be an attempt to

simultaneously disavow the pleading currently in effect and avoid potential statute of limitations

problems that could arise were he to voluntarily dismiss the Amended Complaint and commence

a new action.  The Court rejects his proposed solution.  Nothing other than Doctoroff's

withdrawal of the offending pleading (within the now-expired safe harbor period) would cure the

Rule 11 violation he has committed, and the Court will not spare him from sanctions based on

his tactical preference.

---

[9] At oral argument, counsel appearing for Doctoroff personally in connection with the
Rule 11 sanctions motion stated: "In this particular context, you can dismiss the old complaints
but I don't want any part of them.  I want to be able to file a new complaint . . . That's all I ask.
If I'm not prejudiced by virtue of the statute of limitations or something else, I am not  - - I'm not
wrapping my arms around their complaint.  I want my own."  (1/20/09 Tr. Motions for Sanctions
53:24 - 54:7.)

### E.    Misconduct Warranting Dismissal of Action Under Rule 11

The wrongdoing of Gentile, Federman, Smith and Doctoroff with regard to each one's role in prosecuting this action has been detailed, and the Court has given its reasons for imposing extraordinary Rule 11 sanctions against Federman, Smith and Doctoroff. Nevertheless, the Court believes that its decision to impose the sanction of dismissal of the Amended Complaint without prejudice warrants further discussion as to why the circumstances of this case render any lesser sanction ineffective. In particular, the Court wishes to expound on the general scheme of abuse of our judicial system, a scheme of which this lawsuit and these culpable individuals were but one aspect.

The record before the Court suggests that these proceedings and the RICO action proceedings were all part of a choreographed strategy by Biovail and its attorneys designed to constitute a counterattack against the Biovail securities action. The record demonstrates that highly experienced professionals, i.e., the attorneys who filed and pursued the Del Giudice action and the RICO action, were ready and willing tools of Biovail. They ignored their professional and ethical obligations and aided Biovail for their own benefit. The proceedings before this Court in connection with the Rule 11 sanctions motions have given the impression that all the parties to this strategy believe that they can avoid responsibility simply by pointing at each other, and ultimately at Doctoroff, who argues that he did not actually "sign" anything but, as he would have the Court accept, merely lent his name and position as a shareholder to further the suit. This Court refuses to accept that parties and attorneys can engage in such unabashed manipulation of our federal and state courts and yet continue to pursue a lawsuit which was filed

23

without even the pretense of a factual investigation by the filer. Our judicial system is not quite so impotent.

The Court recognizes that it is a rare situation in which a case is dismissed as a Rule 11 sanction without an evaluation of the substantive merit of the claims. Indeed, this Court has rejected such efforts on numerous occasions in other cases. Here, however, the conduct is so egregious, and the futility of imposing alternate sanctions is so clear, that dismissal is the only appropriate sanction. Moreover, the suitability of this disposition is highlighted by the fact that Messrs. Federman and Smith themselves ultimately recognized the inappropriateness of continuing the litigation. They would have dismissed the claims following the safe-harbor notice provided by Defendants if not for Doctoroff's conclusion that the Amended Complaint should not be dismissed, a conclusion he reached, as far as the record demonstrates, without having reviewed any of the support for the Amended Complaint's allegations and claims.

If Doctoroff and his personal counsel believe that they have viable claims against any of these Defendants, they are perfectly free to file them, subject of course to the constraints of Rule 11 and the applicable statute of limitations. What they will not be permitted to do is to piggyback their claims onto the wholly tainted and discredited Amended Complaint currently before the Court.

Therefore, the Court will dismiss the Amended Complaint in its entirety without prejudice and without leave to amend.

**III.    CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part the motions for Rule 11 sanctions against Gentile, Federman and Smith filed by BAS and Maris and by the SAC Defendants.  The motions for sanctions against Del Giudice, Federman and Smith filed by Cohen and Healey, McCarthy and the Gradient Analytics Defendants will also be granted in part and denied in part.  Defendants' various motions for Rule 11 sanctions against Doctoroff will be granted.  The Court will order the Amended Complaint dismissed without prejudice as a sanction against Lead Plaintiff, Lead Counsel and Liaison Counsel.  An appropriate form of Order will be filed together with this Opinion.

                                    _____s/ Stanley R. Chesler_____
                                      STANLEY R. CHESLER
                                      United States District Judge

DATED: February 19, 2009